**UNITED STATES of America**

**v.**

**Thomas MOOTY et al.**

**Criminal Action No. 12–616.**

United States District Court,
E.D. Pennsylvania.

Signed March 10, 2015.

Karen S. Marston, US Attorney's Office, Philadelphia, PA, for United States of America.

James M. Polyak, Reading, PA, for Thomas Mooty.

## MEMORANDUM

PRATTER, District Judge.

This case concerns an alleged narcotics trafficking conspiracy. The Second Superseding Indictment (Doc. No. 200) details a conspiracy by which the defendants transported drugs from Los Angeles to Philadelphia on commercial flights and through the mail. Defendants Joseph Adens, Antwaun Evans, and Shanice Jenkins have each filed motions to suppress evidence obtained by the Government, arguing that their Fourth Amendment rights against unreasonable searches and seizures were violated.

The challenges arise from three primary sets of interactions with law enforcement: (1) on July 19, 2011, at the Los Angeles International Airport ("LAX") resulting in the seizure of several thousand dollars' worth of currency from Mr. Adens; (2) on May 23, 2013, also at LAX, and involving the seizure of several thousand dollars' worth of currency from Mr. Evans and Ms.

Jenkins; and (3) on November 27, 2012, when FBI agents stopped a rented 2012 Chrysler 200 in which Messrs. Adens and Evans were traveling. This third interaction led to the eventual seizure of evidence from the rented car, from another car driven by Mr. Evans, from Mr. Evans's person, and from Mr. Evans's apartment. It also led to the arrests of Messrs. Adens and Evans.

The Court will deny each of the motions to suppress, save for Mr. Adens's Motion to Suppress (Doc. No. 155), which is denied in part and granted in part.

## I. July 19, 2011 Stop of Mr. Adens at LAX

### a. Facts [1]

On July 19, 2011, Officers Sapper, Lopez, and Villaflor, members of the LAX Narcotics Task Force, were monitoring passengers deplaning from U.S. Airways flight 1405 arriving in Los Angeles from Philadelphia. The LAX Narcotics Task Force is comprised of law enforcement personnel from the Los Angeles County Sheriff's Department, the Drug Enforcement Administration, and the Los Angeles Police Department. This particular flight was known by law enforcement personnel to be popular among drug couriers, especially because Philadelphia is a known consumer city for drugs and Los Angeles is a known source city. The LAX Narcotics Task Force officers were wearing plain clothes and monitoring the passengers for any suspicious activity. Mr. Adens caught the eye of the officers due to his quick pace, the fact that he was looking around nervously, was carrying only a high-end (Gucci) backpack, did not collect any fur-

---

1. A suppression hearing was held on December 11, 2013, at which hearing Officers Sapper, Lopez, and Villaflor of the LAX Narcotics Task Force testified. Transcript references will be set forth as 12/11/13 Tr. [page: line]. The Court finds the officers' testimony credible and makes the following findings of fact.

ther luggage at baggage claim, and quickly exited the terminal toward the taxis.

Officer Lopez approached Mr. Adens outside the terminal, identified himself as a member of law enforcement, told Mr. Adens that he (Adens) was not in any trouble, and asked Mr. Adens if he wouldn't mind answering a few questions. Mr. Adens agreed to speak with him. Officer Lopez asked Mr. Adens for his identification, which Mr. Adens provided. Officer Lopez promptly returned his identification card, and then asked where Mr. Adens had purchased his plane ticket. Mr. Adens responded that his ticket was a buddy pass, which is a ticket provided to airline employees, and that he had acquired the ticket that same day. This response raised Officer Lopez's suspicions, because drug couriers often purchase tickets in the immediate day or days before a flight. Officer Lopez asked Mr. Adens how long he would be in Los Angeles, to which Mr. Adens replied "three to four days," but he lacked specific plans on where he was staying and when he would be returning. 12/11/13 Tr. 76:23–77:5.

Officer Lopez then asked whether Mr. Adens was carrying any contraband or large amounts of U.S. currency, and Mr. Adens said he had $3,000 in his pocket. Officer Lopez asked Mr. Adens whether the Gucci backpack was his and whether he knew what it contained, and Mr. Adens replied that it was his and that he did know what it contained. Officer Lopez then asked if he could search the backpack, and Mr. Adens said he could. This search revealed a large amount of U.S. currency in plastic wrap. Officer Lopez asked Mr. Adens what the money was for and how much there was, and Mr. Adens said he did not know. Officer Villaflor had been standing 58 feet away from Officer Lopez and Mr. Adens throughout this interaction, and, at some point, Officer Sap-

per arrived on the scene of the interaction and also stood about 5–8 feet away.

Officer Lopez then asked Mr. Adens if he would mind accompanying him back to the office, which was visible from where they were standing about 500 yards away, and Mr. Adens agreed to do so, bringing his own backpack, with all the currency inside it, with him. On the walk over, Officer Lopez asked Mr. Adens whether the money was his, and Mr. Adens replied that it was his, but did not know how much there was. When asked why, if the money was his, he did not know how much money there was, Mr. Adens said "okay, well, the money is not mine." 12/11/13 Tr. 80:22–23.

Once in the office, Officer Lopez asked Mr. Adens if he would remove everything from his pockets, which he did, removing his phone and wallet. Officer Lopez asked if he could do a pat-down on Mr. Adens, and Mr. Adens agreed to it. Officer Lopez then asked if he could search Mr. Adens's phone and wallet, and Mr. Adens said "yes," he could. 12/11/13 Tr. 81:10–12. Officer Lopez asked Mr. Adens how much money he made last year, and Mr. Adens replied that he made none because he did not work then and does not work now. Meanwhile, Officer Villaflor further searched the Gucci backpack, discovering more currency. The officers placed the currency in an evidence bag and had a K–9 officer sniff the currency for narcotics, and the K9 officer alerted to the presence of narcotics on the money.

Officer Lopez confronted Mr. Adens with the information that the K–9 officer had alerted to the presence of narcotics on the currency, and Mr. Adens replied that he does not "do drugs." 12/11/13 Tr. 84:22. Mr. Adens then asked to speak with his attorney, and he did so on his cell phone in private. Following the conversation with his attorney, Mr. Adens said that he had found the bag, that the money was

not his, and that the clothes were his. Mr. Adens then said, "That's all I want to say. I don't want to be a snitch." 12/11/13 Tr. 86:1–2. Following this statement, Officer Lopez asked Mr. Adens an additional question about his connection to the currency.[2] Mr. Adens was then asked to sign a disclaimer form. He refused to fill out the disclaimer form, so a member of the LAX Task Force filled it out for him. Mr. Adens signed the disclaimer form, which said that the money did not belong to him. Mr. Adens then left carrying his backpack but without the currency. The entire encounter described above lasted approximately 45 minutes.

### b. Analysis

The Court finds that Mr. Adens's encounter with law enforcement was, until the moment when Mr. Adens stated that he no longer wished to speak with law enforcement, a consensual one. A consensual interaction with law enforcement "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). An encounter with police is consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business.' " *Id.* Whether such an encounter was consensual is evaluated under the "totality of all the circumstances and is a matter which the Government has the burden of proving." *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (citation omitted).

The Court finds that Mr. Adens cooperatively engaged with the LAX Narcotics Task Force. Officer Lopez was dressed in plainclothes, calmly approached Mr. Adens, told him that he was not in any trouble, and asked if he would agree to answer a few questions. Mr. Adens so agreed. Officer Lopez used a calm voice and did not block Mr. Adens's path to exit the airport. Officer Lopez returned Mr. Adens's identification card promptly after asking for it and inspecting it. Detective Lopez asked for permission before searching Mr. Adens's backpack, and Mr. Adens voluntarily consented. There is no evidence that Mr. Adens ever hesitated or refused consent.

Mr. Adens also consented to accompany the LAX Narcotics Task Force operators on the short walk to their office for further investigation as to the currency. Mr. Adens was not told that he was suspected of committing a crime, was not told that he was not free to leave, his path to the exit was not blocked, and he retained his belongings throughout the walk to the office. These crucial facts demonstrate why this case is distinguishable from *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment."). Once back at the office, Mr. Adens was never told that he was under arrest and was never physically restrained in any way. Mr. Adens did not face any threats or any show of force. *Cf. Mendenhall*, 446 U.S. at 557–58, 100 S.Ct. 1870. *Like in Mendenhall*, Mr. Adens was acting "voluntarily in a spirit of cooperation." *See id.* at 557, 100 S.Ct. 1870. And, unlike even the defendant in *Mendenhall*, Mr. Adens did not, until after he had spoken with his lawyer,

---

**2.** The Government has represented to the Court that it will not move to introduce this question and Mr. Adens's response to it at trial.

express any hesitance or unwillingness to cooperate. *Cf. id.* at 559, 100 S.Ct. 1870 (holding that even though suspect stated that "she had a plane to catch," "the trial court was entitled to view the statement as simply an expression of concern that the search be conducted quickly").

■ However, Mr. Adens did state, once he had spoken with his attorney, and after he again reiterated that the money was not his, that he did not want to answer any more questions. The Court finds that at this point the consensual nature of the encounter ended. Mr. Adens's statements of "that's all I want to say" and "I don't want to be a snitch," signal an unwillingness to continue cooperating and consenting in the encounter. Mr. Adens's refusal to write on the disclaimer form himself further signals that he was no longer consenting and cooperating in his interaction with law enforcement. That he was then asked more questions and made to sign a disclaimer demonstrates to the Court that an objectively reasonable person would not have felt free to leave at that point. The Government has failed to convince the Court by a preponderance of the evidence that Mr. Adens consented to remain in the office, answer further questions, and sign the disclaimer form following his stating that he had said all he wanted to say. The Court will therefore not admit any evidence from the interaction between Mr. Adens and law enforcement following Mr. Adens's statement of "that's all I want to say."

■ The Court does agree with the Government that even if the Court were to find that Mr. Adens did not originally consent to accompany the officers to their office, the police had reasonable suspicion at that point to justify a limited investigative detention under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court has held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* The acts giving rise to reasonable suspicion need not be themselves criminal and may be capable of innocent explanation. *United States v. Valentine,* 232 F.3d 350, 356 (3d Cir.2000). However, "[t]he officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quotation marks omitted). The "totality of the circumstances—the whole picture" must support a finding of reasonable suspicion. *Id.*

By the time Mr. Adens was asked to join Officer Lopez in the office, Officer Lopez knew that Mr. Adens had purchased his one-way ticket shortly before the flight to Los Angeles, that the ticket was a buddy pass, that Mr. Adens had no specific plans on where he would stay in Los Angeles and only knew approximately how long he would be staying, that Mr. Adens was carrying a large amount of currency, that Mr. Adens's backpack contained more currency than Mr. Adens claimed it did, and that Mr. Adens claimed to be unaware of the source of the currency in his backpack, even though he had shortly beforehand claimed to have been aware of the contents of his backpack. These facts together amount to reasonable suspicion sufficient to justify detaining Mr. Adens briefly to investigate further the source and purpose of the large amounts of currency.

However, the Court also finds that Mr. Adens's detention following his statement that he no longer wished to answer questions was beyond the bounds of *Terry*. The purpose of the limited investigative detention was to investigate the circumstances surrounding the currency being carried by Mr. Adens. This purpose had been effectuated by the time Mr. Adens stated that he did not want to speak further with law enforcement. Mr. Adens had conclusively conceded by that point that the currency was not his, the LAX Task Force had conducted a canine narcotics test on the currency, and the members of the LAX Task Force had already determined that they would seize the currency. The further questioning of Mr. Adens, after the LAX Task Force had apparently determined their course of action concerning the currency, would have appeared to an objective person to be an indefinite detention akin to an arrest. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop."). Because Mr. Adens was asked to sign the Disclaimer Form (which he had refused to fill out himself) following the additional questioning that the Court finds tipped the scale from investigative detention to custodial interrogation, and because Mr. Adens was not informed of his *Miranda* rights prior to signing the disclaimer form, the Court will exclude the disclaimer form as evidence.

Accordingly, the Court grants in part and denies in part Mr. Adens's Motion to Suppress (Doc. No. 155).

---

**3.** A suppression hearing was held on November 18, 2014, at which hearing Detective Spears and Detective Moore of the Los Angeles County Sheriff's Office and the LAX Narcotics Task Force testified. Transcript references will be set forth as 11/18/14 Tr. [page: line]. The Court finds the detectives' testimony credible and makes the following findings of fact.

## II. The Investigation at Los Angeles International Airport on May 23, 2012

### a. Facts [3]

On May 23, 2012, Detectives Roland Spears and Victor Moore were monitoring the passengers arriving in Los Angeles from Philadelphia on U.S. Airways Flight 797. Detectives Spears and Moore are also members of the LAX Narcotics Task Force, which was, as mentioned above, routinely monitoring flights arriving from Philadelphia, a consumer city of narcotics, to Los Angeles, a source city. They were wearing plain clothes and their weapons were not visible.

Detectives Spears observed Mr. Adens deplane and enter the airport. Mr. Adens was, according to Detective Spears, looking around and looking back as if looking out "for law enforcement or looking for another passenger or both." 11/18/14 Tr. 9:12–13. Mr. Evans also caught Mr. Spears's attention when he left the plane. Mr. Evans "did the exact same thing, looked around constantly, even looked back, and gave [Detective Spears] the impression that he was looking for police or looking for another passenger." 11/18/14 Tr. 10:20–23. Detectives Spears and Moore followed Messrs. Adens and Evans toward the baggage claim area. On the way, they watched as a woman, later identified as Ms. Jenkins, approached Mr. Adens and handed him a zebra-striped bag. She then drifted back and walked near, but not with or alongside, Messrs. Adens and Evans. Detective Spears believed "that [Adens, Evans, and Jenkins] were together, but pretending not to be together." 11/18/14 Tr. 14:13–15.

Upon reaching the baggage claim area, Detective Spears watched as Mr. Adens walked outside and Ms. Jenkins and Mr. Evans walked toward the baggage claim area. Detective Moore followed Mr. Adens outside and Detective Spears continued observing Mr. Evans and Ms. Jenkins. Detective Spears watched as Mr. Evans and Ms. Jenkins continued not to interact with one another beyond "mak[ing] eye contact one or twice." 11/18/14 Tr. 16:17–18. Detective Spears "did not see them have a conversation at all." 11/18/14 Tr. 16:20–21. Mr. Evans picked up two bags from the carousel, walked over to where Ms. Jenkins was sitting, and handed her one of the two bags.

At this point, Detective Spears approached Mr. Evans and Ms. Jenkins and identified himself as a Los Angeles County Sheriff's Detective and as a law enforcement officer at the airport. He was not blocking Mr. Evans's or Ms. Jenkins's path to the exit. He told them that they were not under arrest and asked if he could ask them any questions, to which they answered "yes." Mr. Evans and Ms. Jenkins each produced a Philadelphia identification card, which Detective Spears handed back to them. Detective Spears then asked Mr. Evans and Ms. Jenkins about their travel, including the purpose of their travel, how they bought their tickets, whether the tickets were one-way or round trip, and whether they were traveling with anyone else. They answered that they were boyfriend and girlfriend traveling to Los Angeles on vacation, that the tickets were one-way, and that they were traveling alone. Further, Mr. Evans told Detective Spears that he had purchased his ticket the day before the flight in cash. Ms. Jenkins said that her ticket was a "buddy pass"—essentially a voucher for travel that the airlines provide their employees—that she had acquired the day before the flight as well.

These answers aroused some suspicion in Detective Spears, who testified that drug couriers typically purchase one-way tickets at the last minute, and often obtain tickets from third parties so as to leave less of a paper trail. Detective Spears had also seen Mr. Evans and Ms. Jenkins interact with Mr. Adens, who Ms. Jenkins had handed a zebra-striped bag and who had acted so similarly to Mr. Evans when he had exited the plane.

Detective Spears next asked Mr. Evans and Ms. Jenkins whether they were traveling with any contraband, any narcotics, or a large sum of money. Mr. Evans said he was traveling with $4,000 and Ms. Jenkins said she was traveling with $5,000. Detective Spear asked Ms. Jenkins if he could search her bag, and she said "yes" he could. 11/18/14 Tr. 21:20. Detective Spears searched her bag and discovered a large bundle of cash, which he told her appeared to contain more than $5,000. He asked her whether she was traveling with any more money, and she replied that she was not. Detective Spears continued to search the bag and then found a second bundle of cash. He asked her whether she knew how much cash, in total, she was carrying. She replied that she did not.

Detective Spears then asked Mr. Evans if he could search his bag. Mr. Evans said "yes" he could. 11/18/14 Tr. 22:20. Detective Spears uncovered two bundles of U.S. currency in Mr. Evans's bag as well. Detective Spears then asked Mr. Evans and Ms. Jenkins if they would accompany him to his office to look into the circumstances surrounding the currency further. They agreed to accompany him to his office, about 200 to 300 yards away.

Meanwhile, Detective Moore observed Mr. Adens outside talking on a cell phone. Once Mr. Adens stopped talking on his cell phone, Detective Moore approached him and identified himself as a deputy sheriff

assigned at the airport. He asked Mr. Adens if he would be willing to answer some questions, and Mr. Adens said "yes" he would. 11/18/14 Tr. 87:20. Detective Moore twice asked Mr. Adens if he was traveling by himself, and Mr. Adens twice said that he was by himself, appearing agitated upon answering the question the second time. When asked who had handed him the zebra-striped bag, Mr. Adens replied that it was his fiancée. Detective Moore asked if, other than his fiancée, Mr. Adens was traveling with anyone else, to which Mr. Adens replied that he was not.

Detective Moore told Mr. Adens he worked on the narcotics task force and asked Mr. Adens if he was traveling with any large sums of money or illegal narcotics. Mr. Adens told him he had $2,000 and showed it to Detective Moore. Detective Moore asked Mr. Adens for his identification, which Mr. Adens handed to him. Detective Moore then handed the identification card back to him. Detective Moore then asked if Mr. Adens would accompany him to see Ms. Jenkins (who Mr. Adens had said was his fiancée).

Detectives Moore and Spears, as well Mr. Evans, Mr. Adens, and Ms. Jenkins all converged about 75–100 yards from the office. Detective Spears informed Detective Moore that Mr. Evans and Ms. Jenkins were each traveling with considerable sums of currency that they had understated in response to Detective Spears's inquiries. Detective Moore then asked Mr. Adens if he would accompany the detectives to the office, "being that his fiancée was in possession of a questionable amount of money as well as the fact that he was not truthful about who he was traveling with." 11/18/14 Tr. 91:17–21. Mr. Adens agreed to accompany the detectives and other defendants to the office.

Once in the office, Mr. Evans and Ms. Jenkins were each placed in an interview room while Mr. Adens sat in the lobby area of the office. Once in the office, Detective Spears asked Mr. Evans how much currency he was traveling with and whether the money belonged to him. Mr. Evans said he did not know how much cash there was and claimed that the money did not belong to him and that he did not know to whom it belonged or how it got in his luggage. He signed a disclaimer to this effect. Also while in the interview room, Detective Spears searched Mr. Evans's bag and his person, discovering no other bundles of cash in the bag, but he did discover cash in Mr. Evans's jacket and pants pockets.[4] A K–9 Officer alerted to the presence of narcotics on the currency, which was seized by the LAX Narcotics Task Force. Detective Spears provided Mr. Evans with a receipt for the seized currency.

Meanwhile, Detective Moore interviewed Mr. Adens and then Ms. Jenkins. Detective Moore asked Mr. Adens to remove the items from his person, which Mr. Adens did, placing the items on a table. Mr. Adens claimed to be unaware that Mr. Evans and Ms. Jenkins were carrying large amounts of cash. He said he knew Mr. Evans but that it was a coincidence that Mr. Evans was on the same flight as he and Ms. Jenkins were. Mr. Adens said his plane ticket was a buddy pass but that he could not remember which employee had sold or given him the ticket. A DEA agent in the office informed Detective Moore that Mr. Adens had previously had over $100,000 in currency seized from him. Detective Moore asked to search Mr. Adens's bags and Mr. Adens agreed. Detective Moore found no contraband or large amounts of currency in either of Mr.

---

**4.** It is unclear from the record whether the disclaimer was signed before or after this other cash was discovered by Detective Spears.

Adens's bags. Detective Moore then told Mr. Adens he could either wait in the office or outside the office for his friends.[5]

Detective Moore then spoke with Ms. Jenkins in the same room. He asked her about her relationship with Mr. Evans and Mr. Adens, and she claimed that Mr. Evans was her boyfriend and that she did not know Mr. Adens. When Detective Moore confronted her about Mr. Adens's claim she was his fiancée, she changed her story and said that she and Mr. Adens were only friends but that they had traveled to Los Angeles together. Ms. Jenkins, when asked about the money in her possession, claimed to have received the cash as a result of a large insurance settlement. However, she could not provide Detective Moore with any confirmation of this settlement, nor could she provide the contact information of a person capable of confirming this settlement. A K–9 officer alerted to the presence of narcotics on the currency found in her possession. Detective Moore informed Ms. Jenkins that the money was going to be seized, to which Ms. Jenkins "had no reaction at all." 11/18/14 Tr. 107:25. Ms. Jenkins refused to sign a disclaimer and continued to claim the money belonged to her, but did not later file a protest to the seizure, despite having been informed by Detective Moore how to do so.

### b. Analysis

Mr. Evans and Ms. Jenkins each seek to exclude the evidence obtained during the May 23, 2012 interaction with the LAX Narcotics Task Force. Mr. Evans contends that he did not voluntarily consent to his interview with Detective Spears. A reasonable person, Mr. Evans argues, would not have felt free to refuse the requests of Detective Spears and end the interaction. Therefore, Mr. Evans argues, he was illegally seized within the meaning of the Fourth Amendment. Ms. Jenkins argues that the police lacked probable cause and reasonable suspicion for her initial detention and that she did not consent to accompany Detective Spears to the security office. The Government argues that the encounter Mr. Evans and Ms. Jenkins had with the LAX Narcotics Task Force was consensual. The Court agrees.

■ The Court finds that Mr. Evans and Ms. Jenkins voluntarily consented to the requests of Detective Spears in the baggage claim area to search their luggage. Detective Spears approached Mr. Evans and Ms. Jenkins in the baggage claim area after the two had retrieved their luggage, without blocking their path to the exit. Detective Spears was in plain clothes, without any weapon visible. He identified himself as law enforcement and informed them that they were not under arrest. He asked if he could ask them a few questions, and both Mr. Evans and Ms. Jenkins said "yes." Mr. Evans and Ms. Jenkins each provided identification cards, which Detective Spears handed back after reviewing them. After asking about Mr. Evans's and Ms. Jenkins's travel arrangements and plans in Los Angeles, as well as whether they were carrying large amounts of currency, Detective Spears asked if he could search Ms. Jenkins's bag, to which she replied "yes." After searching her bag, he asked if he could search Mr. Evans's bag, to which he replied "yes." These key facts drive the Court's conclusion that a reasonable person in Mr. Evans's and Ms. Jenkins's situation would have felt free to refuse to answer Detective Spears's questions and end the encounter with law enforcement.

Mr. Evans and Ms. Jenkins rely on *Royer* for the argument that their interaction

---

**5.** Detective Moore, at the suppression hearing, could not recall which Mr. Adens chose to do. 11/18/14 Tr. 101:3–5.

with law enforcement was not consensual. However, the facts here are distinguishable in significant ways from *Royer*. Here, unlike in *Royer*, Detective Spears informed Mr. Evans and Ms. Jenkins that they were not under arrest and did not tell them that he "had reason to suspect [them] of transporting narcotics." *Cf.* 460 U.S. at 494, 103 S.Ct. 1319 ("[T]he detectives informed Royer that they were in fact narcotics investigators and that they had reason to suspect him of transporting narcotics."). Detective Spears returned Mr. Evans's and Ms. Jenkins's identification documents after looking at them. *Cf. id.* ("The detectives did not return his airline ticket and identification...."). In *Royer*, the detectives had retained the defendant's airline ticket, in essence restricting his ability to continue on his way, but no such restriction on movement occurred here, as Mr. Evans and Ms. Jenkins had already reached their destination airport (and had already retrieved their checked luggage). *Cf. id.* These distinctions go to the heart of the voluntariness analysis in *Royer*. *Cf. id.* at 501, 103 S.Ct. 1319 ("Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.'" (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870)).

For similar reasons, the Court finds that the decisions of Mr. Evans and Ms. Jenkins to accompany Detective Spears to his office were consensual. De-

tective Spears did admit at the suppression hearing that had Mr. Evans and Ms. Jenkins not agreed to accompany him to the office, he would have detained them. However, this fact is only relevant to the extent, if any, this subjective intent was conveyed to Mr. Evans and Ms. Jenkins, such that they would have formed an objectively reasonable belief that they were not free to leave. *See Michigan v. Chesternut*, 486 U.S. 567, 576 n. 7, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) ("Of course, the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted."); *Mendenhall*, 446 U.S. at 555 n. 6, 100 S.Ct. 1870 (opinion of Stewart, J.) ("[T]he subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent."). The evidence presented to the Court shows that Mr. Evans and Ms. Jenkins voluntarily accompanied Detective Spears to his office. Notably, Detective Spears did not inform Mr. Evans or Ms. Jenkins that they were suspected of drug trafficking or committing any crime. Rather, Detective Spears "told [Mr. Evans that he] would like to find out where this money came from, if there is any other money, and what the purpose [of the money] is. And [he] asked them if they would come back to the office and they said yes." 11/18/14 Tr. 73:4–8. At no point during the walk to the office did Detective Spears touch Mr. Evans or Ms. Jenkins, restrict their movement, or tell them they were under arrest. Mr. Evans and Ms. Jenkins carried their own bags and had possession of their identification. From the totality of these circumstances and the other facts presented, the Court concludes that Mr. Evans and Ms. Jenkins voluntarily accompanied Detective Spears to his office. *Cf.*

*Mendenhall,* 446 U.S. at 557–58, 100 S.Ct. 1870 ("The [defendant] herself did not testify at the hearing. The Government's evidence showed that the respondent was not told that she had to go to the office, but was simply asked if she would accompany the officers. There were neither threats nor any show of force. The respondent had been questioned only briefly, and her ticket and identification were returned to her before she was asked to accompany the officers.").

 But even if the decision of Mr. Evans and Ms. Jenkins to accompany Detective Spears to his office was not consensual, the Court would nonetheless deny their motion to suppress. As an alternative approach to the issue, the facts support finding that Detective Spears had reasonable suspicion sufficient to justify their brief investigatory detention under *Terry.* Detective Spears's consensual interaction with Mr. Evans and Ms. Jenkins had resulted in a series of circumstances giving rise to reasonable suspicion. The circumstances of Mr. Evans's and Ms. Jenkins's travel plans fit many of the common characteristics of drug traffickers: they had bought their plane tickets at the last minute, had only one-way tickets with no definite return plans, were traveling from a consumer city of drugs to a source city of drugs with a large amount of cash, and had purchased their tickets either using a third party or cash. Detective Spears had observed Mr. Adens, Mr. Evans, and Ms. Jenkins walking through the airport in such a manner that led him to believe "that they were together, but pretending not to be together." 11/18/14 Tr. 14:13–15. This belief was based on how Messrs. Adens and Evans were looking around "constantly" when they got off the plane, as if "looking for police or another passenger," 11/18/14 Tr. 9:10–13, 10:19–23, his observations of Ms. Jenkins handing Mr. Adens a bag and then drifting back and keeping several feet of distance between

them, and the eye contact but lack of communications between the three individuals. Moreover, Detective Spears, by the time he asked if Mr. Evans and Ms. Jenkins would join him in his office, had observed that the two appeared to be lying about traveling alone and appeared to be lying about the amount of currency they were carrying. These facts provided Detective Spears with a reasonable suspicion that Mr. Evans and Ms. Jenkins were engaged in criminal activity, justifying the brief detention in the office at LAX. *Cf. Sokolow,* 490 U.S. at 9, 109 S.Ct. 1581 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.").

 The detention in the office at LAX was limited and proportional to the circumstances giving rise to the reasonable suspicion. Mr. Evans and Ms. Jenkins were not placed in detention cells (LAX indeed has detention cells), but in interview rooms in an office setting where they could look outside. The door to Ms. Jenkins's room, at least, remained open (there is no evidence concerning whether the door to Mr. Evans's room was closed or open). They were informed of the purpose of the inquiries in the office—to investigate the origin and purpose of the large amounts of currency they were carrying. There is no evidence of any coercive, threatening, or intimidating language or gestures during the conversations between the detectives and the defendants.

The members of the LAX Task Force here did not unnecessarily prolong their investigative detention of Mr. Evans and Ms. Jenkins. They "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions" regarding the currency. *Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568. There is no evidence in

the cases of Mr. Evans and Ms. Jenkins that the officers were "dilatory in their investigation" or that the case involved any "delay unnecessary to the legitimate investigation of the law enforcement officers." *Id.* at 687, 105 S.Ct. 1568. The questions of the members of the task force were targeted at uncovering whether Mr. Evans had a legitimate claim to the currency. Indeed, Mr. Evans stated that the money did not belong to him and signed a disclaimer to that effect without undergoing an unnecessarily prolonged interrogation. Ms. Jenkins claimed the money was hers from an insurance settlement, which Detective Moore diligently investigated by attempting to call the two individuals Ms. Jenkins claimed could verify her explanation. Only after he was unable to reach these two individuals at the phone numbers provided by Ms. Jenkins (one of which was seemingly the number for a fax machine, the other, ostensibly the number of a law firm, rang through to an answering service with no indication of it being a law firm), and after a K–9 officer alerted to narcotics on the currency, did the detective inform her that he would be seizing the currency. No handcuffs or other restraints of any kind were used, and Mr. Evans and Ms. Jenkins retained their personal belongings (save the money that was seized). Accordingly, even if Mr. Evans and Ms. Jenkins were detained, their detention was a reasonable investigatory detention under *Terry* and did not elevate into an arrest or custodial interrogation that would have necessitated a *Miranda* warning.

▮ The Court finds that Mr. Evans and Ms. Jenkins consented to the searches of their luggage and their persons in the office. The facts presented to the Court credibly and sufficiently demonstrate that Mr. Evans and Ms. Jenkins freely and voluntarily agreed to cooperate when

asked if they would consent to these further searches. They were not commanded to consent but the officers asked them to consent using calm voices. The setting was not one of custodial interrogation; no restraints were placed on their movement; and no weapons were visible on Detectives Spears and Moore. Mr. Evans or Ms. Jenkins were never told they were under arrest or that criminal consequences would befall them should they deny consent for the searches. And even if they were detained, their detention was not illegal, and their consent, under the totality of the circumstances, was voluntarily given. *See Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("And just as it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning, so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."); *Royer*, 460 U.S. at 502, 103 S.Ct. 1319 ("We also agree that had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him.").

Accordingly, the evidence from this encounter at LAX will not be excluded.

### III. The Stop of the 2012 Chrysler 200 and the Subsequent Investigation

#### a. Facts [6]

On November 27, 2012, members of the violent drug gang task force in Philadelphia were attempting to locate and execute a federal arrest warrant for Mr. Adens. The task force members were conducting surveillance on an area of Philadelphia in

---

**6.** These facts were addressed at the December 11, 2013 and December 19, 2013 hearings.

which Mr. Adens was believed to be present. At around 3:00, members of the task force observed Mr. Adens leave a row home and get into a black Chrysler that had pulled up in front of the house. The black Chrysler began heading west on the two-lane, one-way street. At this point, knowing the task force had unmarked vehicles both ahead and behind the Chrysler, FBI Agent Hunter gave the command to block the street and arrest Mr. Adens. The task force members positioned their cars around the Chrysler. At this moment, the Chrysler, which was being driven by Mr. Evans, quickly reversed, smashing into one of the unmarked FBI vehicles. Mr. Evans jumped out of the driver's side door of the Chrysler and fled by running from the scene, despite the shouts from the agents of "FBI," "Don't Move," "Police," and "Stop." 12/11/13 Tr. 16:5–6. Agent Simpson and others pursued Mr. Evans on foot. Mr. Evans, after running around the corner at the end of the block, finally stopped running and complied with the agents by getting on the ground. Mr. Evans was then handcuffed and taken to the federal building.

Mr. Adens, meanwhile, remained seated in the passenger seat of the Chrysler, which remained running with the keys in the ignition. Agent Hunter placed Mr. Adens under arrest. Agent Hunter then approached the other side of the Chrysler, which was situated in the middle of the street with its door open, the key in the ignition, and the engine running. Agent Hunter got in the driver side of the Chrysler and removed the key from the ignition. In doing so, he noticed two cell phones in the center console of the car. Agent Hunter then got out of the driver's seat and opened the back door of the car and looked inside. Agent Hunter saw a couple of shipping boxes in the back seat, one addressed to Mr. Adens and another to Ms. Jenkins, known by Agent Hunter to be Mr. Adens's girlfriend. Both boxes had

return addresses in California. Agent Hunter also saw a shopping bag from a high-end store that contained a plastic bag containing what appeared to be a package with rounded corners "consistent with how [Agent Hunter] had seen narcotics packaged in the past." 12/11/13 Tr. 24:1–2. Seeing these items, which were observable from outside the car when the doors were closed, Agent Hunter decided the car should be transported to the federal building where a search pursuant to a warrant could occur. Detective Kelhower drove the car himself to the federal building. The FBI agents learned that the Chrysler had been rented from an Enterprise rental location inside a local suburban Jaguar dealership. That evening, FBI agents appeared before a judge and obtained a search warrant for the Chrysler.

Back at the FBI offices, Mr. Evans was advised of his *Miranda* rights. Mr. Evans agreed to waive those rights and speak with Agent Simpson. However, after only a few preliminary questions about where Mr. Evans had rented the car and where he lived, Mr. Evans said, "I think I'd better talk to a lawyer." 12/19/13 Tr. 72:21–22. At this time, Agent Simpson stopped the interview. Mr. Evans was detained for about five hours until the search warrant on the Chrysler was executed. The search revealed packages of what appeared to be, and later confirmed to be, cocaine. After discovering the cocaine, Agent Hunter informed Mr. Evans of the discovery and told him that he was now under arrest for possession of cocaine.

#### b. Analysis

■ Mr. Evans seeks to exclude the evidence obtained from the searches of the Chrysler. Specifically, he challenges Agent Hunter's warrantless on-scene search of the car (and the later search pursuant a search warrant that, the defendants claim, was based on the allegedly

tainted on-scene search of the Chrysler). The Court concludes that the warrantless search did not violate the Fourth Amendment because Mr. Evans had abandoned the Chrysler when he left it running and fled from it.

 "A warrantless search of abandoned property does not implicate the Fourth Amendment, because any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Smith*, 648 F.3d 654, 660 (8th Cir.2011) (quotation marks, alterations, and citation omitted); *see, e.g., California v. Hodari D.*, 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("In sum, assuming that [the police officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied."). "Proof of intent to abandon property must be established by clear and unequivocal evidence." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir.2004).

Here, the Court finds that Mr. Evans demonstrated a clear and unequivocal intent to abandon the Chrysler when, despite the commands of several FBI agents, at least two of whom had a visible display of their authority ("FBI" was emblazoned across the front of Agent Hunter's vest, which he wore under an unzipped jacket, and Agent Simpson wore his gold badge on his holster on his leg), Mr. Evans voluntarily fled the scene, leaving the Chrysler running in the middle of the street with the key in the ignition. Accordingly, he "relinquished any legitimate expectation of privacy he might have had in the [vehicle] and its contents." *Smith*, 648 F.3d 654, 660 (8th Cir.2011) ("[T]he district court determined Smith abandoned the Cadillac 'when he left the car open, with the keys in the ignition, the motor running, in a public area' and then ran from the police. Based on the totality of the circumstances, the district court did not err in concluding Smith relinquished any legitimate expectation of privacy he might have had in the Cadillac and its contents. As such, the district court properly denied Smith's motions to suppress."); *see also United States v. Vasquez*, 635 F.3d 889, 894 (7th Cir.2011) ("The search issue is a dead-bang loser. For one thing, the Bonneville was abandoned, and it's hard to see, under the circumstances here, how Vasquez could argue with a straight face that he maintained an expectation of privacy in it after he ditched it and bolted off on the run."); *United States v. Lawrence*, No. CRIM 06–83, 2007 WL 925893, at *3 (E.D.Pa. Mar. 16, 2007) (Rufe, J.) ("[T]he Court concludes that an objective observer would agree that by running away from his vehicle, Lawrence abandoned it. By leaving his vehicle unsecured on the street, Lawrence also unequivocally manifested his intent to abandon it, thereby relinquishing any expectation of privacy he may have previously held in the vehicle and its contents.").

The Court does not find plausible Mr. Evans's explanation (in the briefing submitted to the Court—Mr. Evans did not testify) that he thought he was fleeing a group of private citizens and therefore did not intend to abandon his vehicle but was forced to do so. Rather, the Court finds credible the testimony of Agents Hunter and Simpson who testified that the agents were verbally identifying themselves and were wearing visible markings of their authority. Mr. Evans's explanation is all the more implausible due to the fact that Mr. Adens remained seated in the front passenger seat and was arrested without incident. Further, Mr. Evans did not submit to the authority of the FBI agents until

there were FBI agents approaching him from his front and back—i.e., until he was "cornered."

Mr. Evans's reliance on a 1973 Third Circuit Court of Appeals opinion, *United States v. Moody*, 485 F.2d 531 (3d Cir. 1973) is misplaced. In *Moody*, the defendant, driving his car, was followed by unmarked cars with nothing clearly identifying the occupants as federal agents. The defendant eventually fled his car on foot, at which point the officers pulled behind the defendant's car and opened the trunk. At no point did the officers identify themselves as federal agents and there were no visible markings signaling their authority. The appeals court therefore concluded that:

> On these facts one could reasonably reach two conclusions: that [the defendant] knew he was being followed by law enforcement agents and was seeking both to avoid arrest and abandon the incriminating evidence in the trunk of his car; or, that he believed he was being pursued by private citizens who intended to do him harm, and that he only left his car temporarily in order to escape this danger. Since only the former state of mind would constitute an abandonment, the evidence on the issue is ambiguous and cannot support a finding that the car and its contents were abandoned.

*Moody*, 485 F.2d at 534. Putting aside the question of whether this reasoning comports with the current state of the law, *cf. United States v. Caraballo–Rodriguez*, 726 F.3d 418, 432 (3d Cir.2013) (en banc) ("Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that the evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." (quotation marks and citation omitted)), the Court does not find that the facts here allow a factfinder to reasonably reach any conclusion other than the one reached by the Court, namely, that Mr. Evans fled law enforcement to abandon the incriminating evidence in his car, hoping to evade the police to be sure, and thereby relinquishing his reasonable expectation of privacy in the car and its contents.[7]

Mr. Evans also seeks to exclude evidence obtained during his detention by the FBI. While Mr. Evans is correct that he was under arrest when he was handcuffed, taken to the federal building, and detained for five hours pending the execution of the search warrant for the Chrysler, the Court agrees with the Government that Mr. Evans's arrest was supported by probable cause. "Probable

---

7. As an aside, the Court notes that the search warrant later executed on the impounded Chrysler, while unnecessary (the FBI had the authority to conduct a full inventory search of the vehicle, and, at any rate, Mr. Evans had abandoned his reasonable expectation of privacy in it) was undoubtedly supported by probable cause. The FBI had an arrest warrant for Mr. Adens who had been a passenger in the vehicle at the time it was stopped. The vehicle was rented for a single day, consistent with a common practice among drug traffickers. The driver of the car, Mr. Evans, had a prior felony drug conviction and had fled headlong upon the appearance of the FBI. Agent Hunter had observed in the car a package consistent with the typical packaging of bulk quantities of narcotics, as well as multiple cellphones, which is consistent with the common practices of drug traffickers. Agent Hunter also had observed packages addressed to Mr. Adens and Ms. Jenkins. By this point in time, the FBI had probable cause to believe that these two defendants were engaged in the sales of narcotics.

cause to arrest exists when 'the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" *Egolf v. Witmer*, 526 F.3d 104, 114 (3d Cir.2008) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).

Here, the FBI had probable cause to believe that Mr. Evans had, in their presence, committed the felony of possession of a controlled substance. By the time the on-scene investigation was completed, and before Mr. Evans was detained at the federal building for questioning, the FBI agents had observed (a) that Mr. Evans had picked up an individual believed to be a major drug trafficker; (b) that Mr. Evans, immediately upon spotting the roadblock set up by the FBI agents, had driven his car quickly in reverse and struck an FBI agent's unmarked car; (c) that Mr. Evans had fled from the scene despite shouts of "FBI," "police," and "stop," *cf. Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); (d) that the vehicle was rented for a single day, consistent with a common practice among drug

traffickers; and (f) that the vehicle contained: (1) a packaging consistent with the typical packaging of bulk quantities of narcotics; (2) multiple cellphones, which is consistent with the common practice of drug traffickers; and (3) packages addressed to Mr. Adens and Ms. Jenkins, whom the FBI had probable cause to believe were engaged in the sales of narcotics and transportations of those narcotics through the mail.[8] These facts together would warrant a reasonable person to believe that Mr. Evans was possessing narcotics and trafficking narcotics.[9] This gave the FBI the authority to place Mr. Evans under arrest. *See Virginia v. Moore*, 553 U.S. 164, 176, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution."). Accordingly, the arrest of Mr. Evans was within the bounds of the Fourth Amendment, and the Fourth Amendment does not require suppression of the physical and verbal fruits of that arrest.

## IV. The Search and Seizure of the 2009 Jaguar XF

### a. Facts[10]

Agent Hunter learned that the Chrysler seized and searched on November 27, 2012, was rented from an Enterprise rent-

---

8. Although the exact chronology is unclear, by the time Agent Hunter submitted his affidavit in support for a search warrant on the Chrysler on the evening of November 27, 2012, he had also learned that Mr. Evans had a prior felony drug conviction. *Cf. United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993) ("The use of prior arrests and convictions to aid in establishing probable cause is not only permissible, but is often helpful. This is especially so where, as in the matter presently before the court, the previous arrest or conviction involves a crime of the same general nature as the one which the warrant is seeking to uncover." (citations omitted)).

9. Although Mr. Evans was first detained and handcuffed prior to the search of the Chrysler, this limited detention until the completion of the on-scene investigation was justified under *Terry*. This limited detention properly escalated into a full arrest once the Chrysler was searched and the FBI agents obtained probable cause to arrest Mr. Evans.

10. Special Agent Hunter of the FBI testified at the suppression hearing held on November 18, 2014. The Court finds Special Agent Hunter's testimony credible and makes the following findings of fact.

al agency at the Main Line Jaguar and Land Rover dealership in Wayne, Pennsylvania. Agent Hunter visited the dealership the next day and spoke with an employee at the Enterprise desk. The employee recalled having rented the Chrysler to Mr. Evans, who had dropped off a Jaguar at the dealership for service. The employee also recalled that Mr. Evans had removed several packages from his Jaguar and placed them in the rented Chrysler. At some point during his visit to the car dealership, Agent Hunter showed the Enterprise employee the photos of the packages found in the Chrysler. The Enterprise employee identified some of these packages as having been the ones he had seen Mr. Evans remove from the Jaguar and place in the rented Chrysler.

Agent Hunter also spoke with an employee of the Jaguar dealership. This employee told Agent Hunter that the Jaguar Mr. Evans had dropped off had come for multiple service-related issues, perhaps connected with flood damage it had sustained. The employee explained that although the car Mr. Evans had dropped off was registered to Thomasina Durham (believed to be Mr. Evans's mother), Mr. Evans was "consistently the person that would drop the car off and pick the vehicle up for service." 11/18/14 Tr. 153:7–8. Ms. Durham appeared only "when it was required for her to physically come into the dealership to sign over insurance checks related to the repairs for the vehicle." 11/18/14 Tr. 153:13–16.

The dealership employee then offered to show Agent Hunter the Jaguar that Mr. Evans had dropped off. The employee took Agent Hunter to the car and opened the driver's side door, asking Agent Hunter if he wished to look inside. Agent Hunter declined to look in the car, though he could see that there were "miscellaneous articles sort of strewn throughout the vehicle, papers, different miscellaneous articles." 11/18/14 Tr. 154:7–9.

Two days later, on November 30, 2012, Agent Hunter returned to the dealership and dropped off the rented Chrysler, returning it to Enterprise. He then obtained the keys to the Jaguar from the same person with whom he had previously spoken. Agent Hunter also learned that Ms. Durham had called the dealership about the Jaguar since Agent Hunter's first visit, but that she was told by the dealership employee that the FBI would be taking the car. Agent Hunter drove the car to the federal building. The Jaguar was not searched until 38 days later, after a search warrant for it had been obtained.

### b. Analysis

The Court concludes that the FBI agents had probable cause to believe that the Jaguar contained evidence of the crime for which Mr. Evans had been arrested, and, therefore, had the authority to seize and search the Jaguar without a warrant. "When federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband." *Florida v. White*, 526 U.S. 559, 563–64, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999). The automobile exception to the Fourth Amendment's general rule requiring a search warrant is premised on both the ready mobility of automobiles and the lesser expectation of privacy in automobiles. *See California v. Carney*, 471 U.S. 386, 390–93, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

Mr. Evans argues that the automobile exception should not apply here because the Jaguar was in the maintenance shop at the dealership and, therefore, not readily mobile. But his argument understates the extent to which the Jaguar remained

readily mobile. The Jaguar was, in fact, mobile when it was at the dealership—indeed, Agent Hunter drove it from the dealership to the FBI building. Because the Jaguar had retained its inherently mobile character, the fact that Mr. Evans could not himself have picked up the Jaguar, due to his arrest, is irrelevant. *See* Wayne R. Lefave, 3 Search & Seizure § 7.2(b) n. 73 (5th ed. 2012) ("[T]he fact the driver is already under arrest is not relevant, as '[r]eady mobility refers to the capability of using an automobile on the highways, not the probability that it will need to do so.' " (latter alteration in original) (quoting *Chavies v. Commonwealth,* 354 S.W.3d 103 (Ky.2011))). And, as a factual matter, the dealership could have released the Jaguar to Ms. Durham.

The Jaguar retained its inherently mobile status while at the dealership and, therefore, fit squarely within the automobile exception to the warrant requirement. *See Carney,* 471 U.S. at 391, 105 S.Ct. 2066 ("Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception."); *cf. United States v. Mercado,* 307 F.3d 1226, 1229 (10th Cir.2002) ("We are of the view that mere temporary immobility due to a readily repairable problem while at an open public repair shop does not remove the vehicle from the category of 'readily mobile.' "). Indeed, courts have regularly allowed for warrantless searches of automobiles in cases where the car was far less mobile than the Jaguar in this case. *Cf., e.g., United States v. Fields,* 456 F.3d 519, 523 (5th Cir.2006) (applying automobile exception after automobile had crashed into a wall); *Mercado,* 307 F.3d at 1229 (vehicle immobile in a repair shop). The delay between the initial observations of the Jaguar, its seizure, and its ultimate search (pursuant a proper, if unnecessary, search warrant) are immaterial. *See United*

*States v. Donahue,* 764 F.3d 293, 300–01 (3d Cir.2014) ("[T]he delay between the time that the government seized the Mustang and the time of the search that uncovered the weapon—five days after the government impounded the vehicle—was immaterial."); *see also United States v. Gastiaburo,* 16 F.3d 582, 586 (4th Cir.1994) (upholding warrantless search of a vehicle 38 days after it was impounded).

Because the Court finds that the seizure and later search of the Jaguar fit within the automobile exception to the warrant requirement, the constitutionality of the search and seizure depends on whether there was probable cause to believe the Jaguar contained evidence of a crime. The Court finds that there was sufficient probable cause to seize and search the Jaguar. The Court has already determined that the FBI agents had probable cause to arrest Mr. Evans for possession of narcotics. There was probable cause to believe the Jaguar would contain evidence of Mr. Evans's possession of narcotics based upon: (a) that Mr. Evans had dropped the Jaguar off at the dealership; (b) that Mr. Evans, while at the dealership, then rented the Chrysler in which narcotics were later found; (c) the packages addressed to Mr. Adens and Ms. Jenkins that were later found in the Chrysler had been removed from the Jaguar and placed in the Chrysler by Mr. Evans; and (d) the facts, recounted above, that led to the arrest of Mr. Evans on November 27, 2012. Further, Agent Hunter had seen, in plain view, personal items and papers strewn throughout the Jaguar. The FBI was aware that evidence of drug trafficking is often found in the receipts and paper records of travel and receipts. The FBI had probable cause to believe that such evidence would be found among the personal items in the Jaguar that Mr. Evans had driven. Accordingly, the Court finds that the seizure and search of the Jaguar was

within the bounds of the Fourth Amendment.

## V. The January 24, 2013 Search of Mr. Evans's Apartment

### a. Factual Background [11]

The search of one of the cell phones recovered from Mr. Evans revealed a number for "Keem," an alias for Defendant Thomas Mooty. The FBI was attempting to locate Mr. Mooty, so they set up a "trap and trace" on Mr. Mooty's number. This trap and trace led the FBI to a cell tower in an area near 633 West Rittenhouse, an address familiar to Agent Hunter, who had observed that address on one of the packages found in the rented Chrysler. That package had been addressed to Joseph Adens at 633 West Rittenhouse, which had not matched any of the known addresses for Mr. Adens. When the FBI agents found themselves in the neighborhood of 633 West Rittenhouse while looking for Mr. Mooty, they decided to speak with the apartment manager about the apartment number found on the package. Agents Hunter and Maxwell met with the apartment manager, who informed them that the apartment was rented to Mr. Evans and co-signed by Ms. Durham (the woman believed to be his mother).

The manager told the FBI Agents that the apartment authorities were in the process of evicting Mr. Evans for nonpayment of rent and were therefore entitled to access the apartment. The FBI Agents accompanied an individual from apartment management to Mr. Evans's apartment, which had an eviction notice posted on the door. When there was no response to a knock at the door, an individual from apartment management opened the door to the apartment and the FBI Agents, suspecting that Mr. Mooty may be inside, entered the apartment and did a "safety sweep" of the unit. After failing to find Mr. Mooty, the agents left the apartment.

Agent Hunter then prepared an application for a search warrant for the apartment. The affidavit in support of the search warrant mentioned that he had conducted a walk-through of the apartment, but did not mention any items Agent Hunter had observed during the walk-through. Instead, it largely relied on the above-recounted facts of the connection between Mr. Evans and the alleged drug conspiracy. A search warrant was issued and executed, and numerous items were seized from Mr. Evans's apartment pursuant the search warrant.

### b. Analysis

 Mr. Evans contends that the initial, warrantless walk-through of the apartment at 633 West Rittenhouse was illegal because the Fourth Amendment prohibits such conduct absent a search warrant. Mr. Evans contends that the fruits of the later search of the apartment pursuant to the search warrant should be excluded, as the later search was a result of the initial, warrantless search of the apartment. However, this argument fails. Because the search warrant for the apartment was issued with probable cause from facts independent of the warrantless walk-through of the apartment, the independent-source doctrine permits the introduction of evidence gathered during the search of the apartment conducted pursuant the search warrant. The Court therefore need not address the question of whether the initial walk-through of the apartment violated the Fourth Amendment.

---

11. As previously noted, Special Agent Hunter of the FBI testified at the suppression hearing held on November 18, 2014. The Court finds Special Agent Hunter's testimony credible and makes the following findings of fact.

■ "The independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *United States v. Stabile,* 633 F.3d 219, 243 (3d Cir.2011) (quotation marks and citation omitted). Thus, assuming the initial entry into Mr. Evans's apartment was illegal, the Court must ask "(1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the [unlawful search] prompted the officers to obtain the [subsequent] search warrant." *Id.* at 243 (quoting *United States v. Herrold,* 962 F.2d 1131, 1144 (3d Cir.1992) (latter alteration in original)). "If the answers to these questions are yes and no respectively ... then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible." *Id.* at 243–44 (quoting *Herrold,* 962 F.2d at 1144).

As to the first question, even if the Court were to credit Mr. Evans's arguments that Agent Hunter did not have the permission of the apartment management to conduct a walk-through of Mr. Evans's apartment or that, regardless, the apartment manager could not consent to such a walk-through, the search warrant that uncovered the evidence to be offered would nonetheless be valid. Although the search warrant does mention that Agent Hunter had walked through the apartment, it does not contain any mention of what Agent Hunter observed during the walk-through or any mention of what he learned from it. Rather, the finding of probable cause for the issuance of the warrant is based entirely upon facts independent of the walk-through. Those independent facts are, as Mr. Evans recognizes, inextricably tied to the other Fourth Amendment issues raised by Mr. Evans. However, because the Court has found valid the earlier searches and seizures, there is no constitutional basis to invalidate the search of Mr. Evans's apartment. The search warrant was based on probable cause that arose from, among other pieces of information, the actions of Mr. Evans on November 27, 2012, the narcotics found on that date in the Chrysler driven by Mr. Evans, the package found in the Chrysler addressed to Mr. Adens, a known drug trafficker, at 633 West Rittenhouse, and the fact that the apartment at 633 West Rittenhouse was leased to Mr. Evans, who had been arrested previously for drug trafficking.

As to the second question, the Court concludes that the warrantless entry into the apartment did not prompt the search warrant for the apartment. The FBI agents had already planned to investigate the apartment unit, *see* 11/18/14 Tr. 166:14–22, and, upon learning that the unit was leased to Mr. Evans, Agent Hunter intended to obtain a search warrant for the apartment unit, *see* 11/18/14 Tr. 172:24–25. Agent Hunter, whose testimony the Court finds credible, testified that the initial walk-through of the apartment unit was for the purpose of seeing whether Mr. Adens was hiding there—not for the sake of determining whether the apartment contained items worth obtaining a search warrant for. Moreover, there is no evidence that any obvious contraband was observed during the walk-through.

## VI. Conclusion

For the foregoing reasons, the Court denies the various motions to suppress, save for Mr. Adens's Motion to Suppress, which is denied in part and granted in part. An appropriate order follows.

**UNITED STATES OF AMERICA**

**v.**

JOSEPH ADENS, ANTWAUN EVANS, and SHANICE JENKINS

AND NOW, this 10th day of March, 2015, upon consideration of Joseph Adens's Motion to Suppress Evidence and Proposed Findings of Fact (Docket Nos. 155, 259), Antwaun Evans's Omnibus Pre–Trial Motion and Memorandum of Law for Suppression of All Physical Evidence Obtained as a Result of an Unlawful Search and Seizure (Docket No. 154, pp. 9–19), Antwaun Evans's Supplemental Motions to Suppress (Docket Nos. 161, 437), Shanice Jenkins's Motion to Join Motions of Other Defendants and Memorandum in Support of Motion to Suppress (Docket Nos. 438, 472),[12] the Government's respective Responses in Opposition (Docket Nos. 177, 180, 258, 264, 452, 485), and the Defendants' Replies and Supplementary Filings (Docket Nos. 265, 479), and after hearings on December 11, 2013, December 19, 2013, and November 18, 2014, the Court hereby ORDERS that:

1. Ms. Jenkins's Motion to Join Motions of Other Defendants (Docket No. 438) is GRANTED;

2. Mr. Adens's Motion to Suppress Evidence (Docket No. 155) is GRANTED in part and DENIED in part;

3. Antwaun Evans's Omnibus Pre–Trial Motion and Memorandum of Law for Suppression of All Physical Evidence Obtained as a Result of an Unlawful Search and Seizure (Docket No. 154, pp. 9–19) and his Supplemental Motions to Suppress (Docket Nos. 161, 437) are DENIED.

12. In her Motion to Join Motions of Other Defendants, Ms. Jenkins specifically seeks to join Mr. Evans's second Supplemental Motion to Suppress (Docket No. 437).